Theron E. COE, Thomas M. Dimmick, John T. Dimmick, Calvin N. Souther, West Coast Steamship Company, an Oregon corporation, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 77–900.

United States District Court, D. Oregon.

Aug. 19, 1980.

W. A. Jerry North, Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, Or., for plaintiffs.

Sidney I. Lezak, U. S. Atty., District of Oregon, Jonathan M. Hoffman, Asst. U. S. Atty., Portland, Or., for defendant.

## MEMORANDUM DECISION

EDWARD C. REED, Jr., District Judge, Sitting by Designation.

Theron E. "Buck" Coe, and others, have sued the United States of America under the Federal Tort Claims Act 28 U.S.C. §§ 1346(b) and 2671, et seq., for damages arising on account of a fire which began on a parcel of federal land administered by the Bureau of Land Management (BLM) and located adjacent to the Deschutes River in Oregon. Plaintiffs allege that both the start and the subsequent spread of the fire to plaintiffs' adjoining lands were proximately caused by negligence of BLM employees. This fire destroyed pasturage and fences on plaintiffs' land, for which they now seek to recover damages.

The area where the fire commenced is informally known as the South Junction campsite. The campsite comprises approximately five acres and is one of the few public land access points to the river which is widely used for water recreation. South Junction campsite is situate in a very picturesque place and is found desirable by many people for use as a camping and recreation area. Access is by a BLM maintained dirt road which extends to and through the property from a nearby paved highway.

The BLM has never formally designated this area as a campground, but on the other hand has never prohibited use of it for those purposes and, in fact, has taken some steps to make the area a pleasant camping place. Trash receptacles have been placed in strategic locations for the use of campers in order to prevent litter. Two waste water facilities have been installed and at least two portable sanitary toilets have been placed on the property. Pictures of the area reveal camping sites which have just sort of grown up like "Topsy" here and there throughout the property. At least some of the campsites have "fire rings", which are simply rings or piles of stones apparently gathered in the area and used to contain camp fires. The best evidence is that these were constructed by campers. Boards on which signs can be posted have been constructed here and there on the property.

The BLM does not charge for the use of the property and while there is no affirmative effort to recruit campers, it appears that BLM has assisted in making this a very inviting spot for camping in a very beautiful country.

Because of its location adjacent to the river and the beauty of the country, it would probably be a camping ground whether or not the BLM took an interest in it or did much about it. But the efforts of the BLM appear to have considerably enhanced it for camping purposes.

The BLM does not maintain any permanent personnel in the immediate area. At the time of the fire, one BLM representa-

tive had been in the vicinity working on a recreation use study.

The question faced by the Court, then, is whether under these circumstances the BLM owes a duty to adjacent property owners to protect them against the possibility of fires which may start within the informal, but well established, camp area and then spread to adjacent properties. The Court must inquire as to what duties are undertaken by the government because it has permitted and, in fact, encouraged the use of this area for recreational purposes.

The fire in question began on July 10, 1976, in the vicinity of the various campsites. It appears to have commenced on a campsite occupied by Darrel Cook, Barbara Cook, Stanley Niblett, and Karen Koch. As best the witnesses can tell, the fire started in the vicinity of a fire ring in the Cook campsite in heavy and dry cheat grass. There had recently been a campfire in the Cook fire ring, but nothing was burning there at the time the fire began. John and Dorothy Poyner, who were camping nearby, saw the fire start and, based on the evidence before the Court, one would have to conclude that it started from a spark from the Cook fire ring or as a result of cigarette smoking by one of the occupants of the Cook campsite.

While the fire was very small in the beginning, and one witness testified could probably have been smothered with a blanket, once it started it spread quickly through the dry and combustible cheat grass which grew in abundance throughout the campground.

The fire was soon out of control, jumping the road, and eventually burning the fences and pasture grasses of the neighboring Kaskela Ranch and Green Valley Ranch. Both of these ranches were leased to Buck Co., Ltd., a limited partnership consisting of Theron E. Coe and Calvin N. Souther. According to the agreement under which the partnership was using and occupying the ranch lands, the lessee was obligated to repair burned fences and required to suffer any losses which were the result of damage by fire to pasture lands. Three–quarters–of–a–mile of fence were destroyed on the Green Valley Ranch and a like amount of fence on the Kaskela Ranch. Mr. Coe personally repaired these fences using his own material, all at a cost exceeding the amount of the claim for damage to fences made in this case. The claim for damage to fences was calculated by multiplying the length of fences damaged or destroyed by the costs per foot of repair or replacement according to established BLM figures then in use. The total claim for damage to fences was $2,180.80.

The loss of cattle feed occasioned by damage to the pasture grass was determined by Mr. Coe on the following basis. He simply endeavored to estimate, in absence of the fire, how many tons of hay would have been harvested by cattle grazing on that property and then multiplied that figure by the going rate for sale of hay in the vicinity at that time. It was estimated that the cows would have harvested 250 pounds of hay per acre and that in view of the fact that there were 550 acres damaged and unuseable, 69 tons of hay which might have been harvested were lost. The 69 ton figure was multiplied by the going sales price of hay of $72.50 per ton for a total of $5,002.50.

One may quarrel with pricing the hay in this fashion because the $72.50 per ton was based upon hay which had been harvested and probably baled with attending labor, materials and transportation costs. On the other hand, harvesting hay by having the cows eat it has its attendant overhead costs as well. There are such costs as tending to the cows, fence maintenance, supervision of the grazing, rentals for the property used, and water, all of which have related labor and materials cost. It probably costs considerably less to have the cows harvest the hay directly than to cut, bail it and feed it to them. There was evidence admitted that, based upon a cost for pasture according to rates charged by the BLM for grazing on its property, the cost of the lost pasture would be less than at a rate of $72.50 per ton. However, the simplistic method of figuring the loss which was of-

fered by Mr. Coe, seems about as good an approach as any and establishes the amount of the loss about as well as it can be determined.

An issue has been raised in this case as to whether there has been compliance with the jurisdictional prerequisites of 28 U.S.C. § 2675(a) and 28 C.F.R. § 14.3. These statutes and rules require that a claim for damages be filed with the appropriate federal agency prior to bringing suit. They also require that where a claim is filed on behalf of another, the person signing the claim must submit accompanying proof of his authority to represent the claimant. Summary judgment has previously been entered on this basis in favor of the defendant against Thomas M. Dimmick and West Coast Steamship Company, so that they are no longer parties to the action. However, summary judgment was denied in respect to the plaintiffs Theron E. Coe, John T. Dimmick, Calvin Souther and Kaskela Ranch, Inc. It is the view of the Court that such denial of summary judgment did not necessarily foreclose the question of whether Mr. Coe had the authority to file claims in behalf of the remaining plaintiffs and otherwise complied with Government regulations pertaining to the filing of claims by one person in behalf of another. The previous rulings on the summary judgment motions determined only that summary judgment was inappropriate at that time, according to the applicable rules.

The evidence in regard to Mr. Coe's authority to present claims, however, is essentially the same as that before Judge Belloni and Judge Juba when they ruled on the previous motion. This is true because it has been stipulated that the statements made in the affidavits of John T. Dimmick, Calvin Souther and Kaskela Ranch, Inc., all of which were previously before the court, are to be treated by this Court as if the affiants had testified in open court, making the same statements as are set forth in the affidavits. The only new element, which was adduced by evidence at the trial, is the testimony of Mr. Coe himself which was heard by the Court. There, certain matters relative to his authority to file the claims were further developed. However, all in all, there was nothing substantially new or different developed at trial.

In *House v. Mine Safety Appliances Co.*, 573 F.2d 609, 617–618 (9th Cir. 1978) the court reviewed this problem which arises where claims are filed by one person in behalf of others. The court held that a mother signing a claim on behalf of minor children need not supply accompanying proof of authority to so sign. In fact the court held that she need not even recite the fact of minority or the applicable state law which grants the authority to the mother. The rationale of *House* is found in the mother's inherent authority to represent the interests of a minor child. She is the automatic legal representative of the child once the claim reaches the litigation stage. The court noted that the government's ability to settle such a case would not be hampered by lack of proof of authority because parents can accept a settlement for the child.

■ In this case, plaintiff Buck Coe filed a claim on behalf of the limited partnership, Buck Coe, Ltd., and signed the claim form "Buck Coe Owner". There was no accompanying proof of Buck Coe's authority to represent the limited partnership. Plaintiff claims that his position as the sole general partner of a limited partnership is similar to that of a parent to a minor child. Consequently under the principles of *House* no accompanying proof of authority was required.

Oregon has enacted the Uniform Limited Partnership act (ORS 69.150, et seq.). This statute indicates that a general partner of a limited partnership has all the rights and powers of a general partner in a general partnership except for certain enumerated exceptions not applicable to this case. ORS 69.350. The Oregon statute provides that a general partner has the authority to bind the partnership to his acts if in furtherance of carrying on the business of the partnership in the usual way. ORS 68.210. Limited partners are not proper parties to proceedings by or against such partnerships

(ORS 69.380). The only person authorized to institute suits on behalf of the limited partnership is consequently the general partner. See e. g., *Fox v. Sackman*, 22 Wash.App. 707, 591 P.2d 855 (1979); 68 C.J.S. Partnership § 200 pg. 669. Such authority arises not out of an express authorization by the partners but by reason of the relationship between the partners unless expressly limited. ORS 68.310.

It appears that "Buck" Coe did have the inherent authority to represent the limited partnership. The government would not be hampered by a lack of showing of authority because the plaintiff could have accepted a settlement on behalf of the partnership. Consequently as to the claim on behalf of Buck Coe, Ltd., there was no failure to meet the jurisdictional prerequisites of 28 U.S.C. § 2675(a) and 28 C.F.R. § 14.3.

■ Buck Coe also filed two other claims, one on behalf of "Green Valley, Thomas Dimmick & Calvin N. Souther" and the other for "Kaskela Ranch, Inc.," by "Buck Coe, Lessee and Manager of property."

■ In *Dobkins v. Hutton*, 129 Or. 648, 278 P. 991 (1929) it was held that the tenant in possession was a proper party to bring an action against an adjacent property owner who had negligently allowed a fire to spread from his land to plaintiff's land burning plaintiff's pasturage and fences. If Buck Coe had filed the claim on behalf of Buck Coe, Ltd., as the tenant in possession, there would presently be no problem under the principles of *House*. But here the claim was filed on behalf of the ranch owners, not the tenant in possession. The filing of such proof of authority by the signator of the claim is jurisdictional and absent exigent circumstances cannot be waived. *House v. Mine Safety Appliances Co.*, 573 F.2d at 618. This Court finds that sufficient proof of authority did not accompany these claims, nor are there such exigent circumstances present which would justify some other procedure than dismissing as to these claims.

■ Title 28 U.S.C. § 1346(b) and § 2671 et seq., waive the sovereign immunity of the United States for claims which result from the negligent acts of employees of the federal government. Immunity is waived only to the extent that a private person would be liable to the claimant under the law of the place where the act or omission occurred. Here the question is, to what extent a landowner under Oregon law owes a duty to protect surrounding landowners from the start or spread of a fire originating on his land. The Oregon courts have spoken to this problem on several occasions and assist us in dealing with the claims of negligence put forth by the plaintiff.

The basic claims of negligence were boiled down by plaintiff at closing argument to:

(a) The BLM failed to ban open burning, although a serious fire danger existed in the area.

(b) The BLM should have built fire breaks.

(c) The BLM should have taken steps to eliminate the dry cheat grass in the campground area.

(d) There was no fire fighting equipment available to BLM employees in the vicinity of the South Junction campground.

■ As to claims (a) and (b) the decisions as to when to institute a ban on open burning, and, if and where to place fire breaks, fall within the discretionary function exception to the waiver of sovereign immunity. 28 U.S.C. § 2680(a). This Court has no jurisdiction to base tort liability on these allegations. *Dalehite v. United States*, 346 U.S. 15, 24–30, 73 S.Ct. 956, 962–65, 97 L.Ed. 1427 (1953); *Morris v. United States*, 521 F.2d 872 (9th Cir. 1975); *United States v. DeCamp*, 478 F.2d 1188 (9th Cir. 1973).

■ Claim (c) involves liability for the start of the fire. Oregon case law points out that liability may be imposed where the landowner in the exercise of ordinary care should anticipate that due to the condition of his premises a fire is likely to start. *Hesse v. Century Home Components, Inc.*, 267 Or. 53, 514 P.2d 871 (1973); *Pacific N.W. Bell Tel. Co. v. Century Home Com-*

pon., Inc., 267 Or. 46, 514 P.2d 874 (1973); Aune v. Oregon Trunk Railway, 151 Or. 622, 51 P.2d 663 (1935); Arneil v. Schnitzer, 173 Or. 179, 144 P.2d 707 (1944).

In Hesse the court stated that mere combustibility alone without a finding of negligent maintenance or storage of materials on defendant's property, is not enough to find liability for the start of a fire of unknown origin. In Arneil, the defendant allowed piles of oil soaked sawdust, tarpaper and other debris to collect. He had been warned by state forestry officials that this condition was highly inflammable. The defendant's property was subsequently found to be a nuisance and he was found liable for the start and spread of fire to plaintiff's property. This was true even though the actual cause of the fire had been a cigarette carelessly tossed by an unrelated third party. In Pacific N.W. Bell, defendant was found liable for placing sawdust mixed with linseed oil and other debris in a wooden trash box. The mixture was described as being highly combustible and in violation of a fire prevention statute. In Aune, the defendant was held not to be liable for a fire which burned buildings adjacent to defendant's railroad yard. There the fire was started in defendant's boxcars by hobos who entered through doors left open by the defendant. The fire then spread to plaintiff's adjacent property.

The problem is to determine where in the above spectrum of cases, the present case lies. This Court finds that the conditions which existed at the campground were not as hazardous as the condition which existed in the Arneil and the Pacific N.W. Bell cases. This Court further finds that the likelihood of fire developing from the conditions present at the campground was not so foreseeable that the landowner should have anticipated its occurrence and taken steps such as removing the cheat grass from the campground in order to prevent the start of fire. Additionally this Court finds that cheat grass is not such a highly inflammable material as to place a duty upon the defendant to take steps to prevent the spread of a fire. See, Comfort v. Stadelman Fruit, Inc., 285 Or. 525, 592 P.2d 213 (1979).

Claim (d), that the BLM was negligent in not having fire fighting equipment in the vicinity of the South Junction campground, appears to be subject to the discretionary function exception. The application of this exception is not as readily apparent as in the case of the first two allegations and consequently requires some discussion.

In Hesse, supra, and in Centraal Stikstof Verkoopkantoor v. Pensacola Port A., 205 F.Supp. 724 (N.D.Fla.1962) (quoted with approval in Comfort v. Stadelman Fruit, Inc., 285 Or. 525, 538, 592 P.2d 213 (1979)), the courts held that a defendant may be negligent in failing to have fire fighting equipment on the premises where the danger of fire is foreseeably substantially greater than on ordinary premises, but that, standing alone, premises with wooden structures situate on them (in Centraal, supra, a wooden pier) do not raise this duty.

Our case is somewhat different in that the defendant (unlike the defendant in Centraal) does in fact have fire fighting equipment. The allegation of negligence is that such equipment was not located close enough to these particular premises. However, the BLM is responsible for administering some twenty–five percent of Oregon's total land area, much of which is seasonally subject to fire danger. Yet the government has only limited resources with which to cope with this problem. Consequently, the government must allocate its resources. In doing so it must consider such factors as access to areas subject to fire, the value of properties threatened and the likelihood of a fire occurring. Allocating resources on the bases of these factors in clearly an exercise of discretion at a planning level on the part of the federal government and is not subject to challenge by a tort suit. 28 U.S.C. § 2680(a). Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Thompson v. United States, 592 F.2d 1104 (9th Cir. 1979). Martin v. United States, 546 F.2d 1355 (9th Cir. 1976). Even if the claims here made were not subject to the discretionary function exception, it does

not appear that there was any negligence involved. The fire occurred close to a paved road; it did not threaten any residential areas or timber stands; and it does not appear substantially more likely that a fire would occur here rather than in many other other areas for which the BLM is responsible.

It is only speculative that stationing of fire fighting equipment in that area would have prevented the fire that occurred from spreading.

This memorandum decision shall constitute findings of fact and conclusions of law of the Court.

IT IS HEREBY ORDERED that judgment in favor of defendant shall be entered forthwith against plaintiffs Theron E. Coe, John T. Dimmick, Calvin Souther and Kaskela Ranch, Inc.